726 P.2d 1088

In re the MARRIAGE OF Hazel BENGE [Collamer], Petitioner/Appellee,

and

Nelson P. Collamer, Respondent/Appellant.

No. 2 CA–CIV 5672.

Court of Appeals of Arizona, Division 2, Department B.

April 23, 1986.

Review Denied Sept. 30, 1986.

Lynn M. Pearlstein, Ltd. by Lynn M. Pearlstein, Phoenix, for petitioner-appellee.

Rodney M. Matheson, Mesa, for respondent-appellant.

BIRDSALL, Judge.

The marriage of the parties was dissolved in Maricopa County by a decree entered in September 1982. The court divided the community property and awarded the appellee the sum of $480,000 payable at the rate of $2,000 monthly until paid in full. The decree contained no provision for interest and required the payments to continue irrespective of death or remarriage. No spousal maintenance was allowed.

This appeal arises out of a judgment entered June 10, 1985, following an evidentiary hearing on an order requiring appellant to appear and to show cause why the payments had not been made. The trial court made extensive findings of fact and conclusions of law. These findings are essential to a thorough understanding of this case and our disposition of the issues presented on appeal, and we set forth many of them in their entirety. We also refer to these findings by original number in our discussion of the issues.

The trial court reviewed the history of the case from entry of the decree finding:

2. From October of 1982 to May of 1984, Respondent made most of the property division payments required pursuant to the 1982 Decree save for certain "deductions" which he deemed appropriate, but which this Court later determined to be unauthorized pursuant to the terms of the Decree. Despite the fact that the monthly payments required to be paid by Respondent were clearly delineated as a division of community property in the 1982 Decree, Respondent claimed these payments as "spousal maintenance" for income tax purposes in the years 1982, 1983 and 1984, and Respondent deducted these payments as same. Respondent caused a 1099 form to be mailed to the Internal Revenue Service, with a copy to Petitioner designating these payments as spousal maintenance.

3. On June 6, 1984, and again on November 21, 1984, respectively, Petitioner above-named recovered Judgments in the above-captioned and numbered cause

against Respondent in the amounts of $6,926.75 and $10,000.00 respectively, which sums represented past due installments on the division of community property payments called for by the Decree, plus attorney's fees in the respective sums of $1,287.00 and $770.00 and costs of $85.00, together with interest thereon. The court also found that the appellant refused to make any payments after the entry of the judgment for arrearages, costs, and fees in June 1984 and that:

5. On December 4, 1984, the Sheriff of Maricopa County, Arizona, returned a request for an execution on any and all property owned by Respondent in Maricopa County, as wholly unsatisfied because no property was found upon which to execute.

The court found that it became necessary for the appellee to initiate an investigation to discover what the appellant had done with his properties. The evidence resulting from that investigation amply supported the trial court's finding that the appellant, in fraud of his creditors, had transferred all of his Arizona property, real and personal, to several corporations, all of which were subject to his control and each of which was his alter ego.

One of the corporations, Mohawk Credit Corporation (MCC), paid the appellant's personal obligations, including the expense of this litigation and alimony of $2,000 monthly to his first wife, Barbara. Although he served as its president, the appellant drew no salary from MCC. He was its sole stockholder and, at one point, he transferred all the MCC stock to the Nelson Collamer Foundation, Inc., an "eleemosynary trust." Despite this descriptive charitable classification, the trial court found that the Foundation was an alter ego of the appellant.

The trial court also made certain findings pertaining to the Employee's Profit Sharing and Retirement Trust of MCC (the Trust). It found that at the time of the 1982 decree the appellant's vested interest therein was $1,387,758. The decree ordered the appellant to pay the $480,000

awarded to the appellee directly from the Trust "to the extent possible." This order contained the caveat that the obligation was nevertheless the appellant's "personal obligation." More recently the appellant's vested interest in the Trust was found to be over $1,500,000. The appellant controls the Trust even though his first wife, two sons, and a daughter serve on its administrative committee. In finding 20 the court characterized the situation as follows:

20. Respondent's exercise of control over the operations of Mohawk Credit Corporation and The Trust is almost absolute. Respondent has the ability, authority and power to direct the Trustee of The Trust to pay any and all sums now due and owing, past due or to become due in the future to Petitioner, and his refusal to pay as provided for by the terms of the Decree and the Judgments subsequently entered against him was done for willful and malicious reasons and to show Petitioner that no Court Order could be effective against him and that Respondent would pay Petitioner that sum of money he felt appropriate, and that he would pay her when he deemed it convenient regardless of Court Orders to the contrary.

With regard to the appellant's Arizona real property, the court stated:

22. On or about November 2, 1982, Respondent transferred the real property described as 5925 East Thomas Road, Phoenix, Arizona, to Mohawk Credit Corporation. At the time of transfer this property was Respondent's sole and separate property pursuant to the terms of the 1982 Decree of Dissolution, and the only real property held by Respondent in his individual capacity.

23. The conveyance of the aforedescribed real property to Mohawk Credit Corporation was made without fair or adequate consideration and with the intent of Respondent to hinder, delay and defraud his creditors including Petitioner from collecting her Judgments in order to preserve the property for Respondent's personal benefit.

24. Respondent does not now have, and did not have at the time of conveyance, sufficient other property in his own name to pay all of his existing debts, including, but not limited to the $2,000.00 per month obligation to Petitioner.

And, with reference to what was apparently the appellant's most valuable asset aside from the Trust, the MCC stock, the court found:

25. On or about May 11, 1983, Respondent caused 300 shares of Mohawk Credit Corporation common stock owned by Respondent to be transferred back to Mohawk Credit Corporation for the total sum of $1,500.00, when the book value of these shares actually exceeded $17,000.00.

26. At the time of this transfer these 300 shares of Mohawk Credit Corporation stock were in Respondent's sole and separate name, held by Respondent in his individual capacity.

27. The conveyance to Mohawk Credit Corporation was made without fair or adequate consideration with the intent of Respondent to hinder, delay and defraud his creditors including Petitioner from collecting her Judgments in order to preserve the property for Respondent's personal benefit. It was part of a plan, scheme and artifice to make Respondent appear to be without assets and to preclude Petitioner from collecting her Judgment for the division of community property then or in the future.

28. Respondent did not have at the time of the conveyance of stock to Mohawk Credit Corporation sufficient property in his own name to pay all of his existing debts.

29. Respondent, in a similar vein, pledged 3,200 shares of Mohawk Credit Corporation stock owned by the Malta-West Ridge Cemetery Associate [sic], another Corporation which Respondent controls, to Mohawk Credit Corporation as security for personal loans made by Mohawk Credit Corporation to Respondent. The book value of these shares owned by Malta-West Ridge Cemetery Association at the time they were pledged for Respondent's personal debt exceeded $57.00 per share, or a total of $182,400.00. Respondent is the only person who has check signing authority for Malta-West Ridge Cemetery Association. [The Association was a corporate entity which the court had found to be an alter ego of the appellant.]

30. On November 19, 1984, Respondent, as the authorized representative of the Malta-West Ridge Cemetery Association, sold 800 shares of Mohawk Credit Corporation stock owned by the Malta-West Ridge Cemetery Association back to Mohawk Credit Corporation for $500.00, when that stock was worth in excess of $45,000.00. Respondent negotiated this sale of stock with himself acting on behalf of both business entities.

31. Also in November of 1984, Respondent purchased $10,000.00 in Mohawk Credit Corporation's debentures and conveyed them to The Nelson Collamer Foundation, Inc., all at a time when according to his own financial statements he was insolvent....

In another finding the court described as an "extreme example" of the appellant's "gamesmanship" his purchase of furniture at a cost of $13,000 with MCC funds for a new home. The appellant then "quitclaimed" this property to his third wife for $5,000. Of major significance is the following finding:

33. By engaging in all of these financial machinations, Respondent has reduced his apparent financial worth from $1,500,000.00 in 1980 to less than zero by December 31, 1984, when his financial statement showed assets of $2,700.00 and liabilities of $356,580.00. That financial statement presented to Petitioner represents an absolute untruth since Respondent, by his control of the various Corporations aforementioned and by virtue of his vested interest in The Trust has a worth in excess of $3,000,000.

Additionally, the trial court made findings pertaining to: 1) the current delinquencies,

$12,000 through May 1985; 2) the fact that previous judgments remained unpaid; 3) attorneys fees; 4) the facts supporting an award of punitive damages; and 5) the factual foundation for an assignment of an interest in the Trust to the appellee. We will discuss and quote these findings as necessary in our consideration of the issues.

We have examined the entire record and find that the evidence presented in the two-day hearing amply supports the factual findings. The appellant does not question these findings, except for a brief argument in his reply brief wherein he claims that the evidence does not support a finding that his conduct was fraudulent. The appellant argues that his conduct did not fall within the purview of A.R.S. § 44–1004 because he was not really insolvent, or A.R.S. § 44–1005, because this is a domestic and not a business transaction. He then contends that A.R.S. § 44–1007 is inapplicable because the evidence does not show actual intent to hinder, delay, or defraud. The appellant is correct that A.R.S. § 44–1005 is inapplicable. We question whether he can now argue that his transfers did not render him insolvent because, according to his own financial statements, he was insolvent. See findings 31 and 33, quoted above. Be that as it may, the appellant misreads A.R.S. § 44–1007. That statute merely distinguishes actual intent from the intent presumed by law in A.R.S. § 44–1004. The actual intent required need not be proven by direct evidence but may be inferred from the circumstances of the transactions. See *Cashion Gin Company v. Kulikov,* 1 Ariz.App. 90, 97, 399 P.2d 711, 718 (1965) (discussing "badges of fraud" from which actual interest can be found); see also *Torosian v. Paulos,* 82 Ariz. 304, 313 P.2d 382 (1957); *In Re D.H. Overmyer Telecasting Co.,* 23 B.R. 823 (N.D. Ohio 1982). Proof of a fraudulent conveyance by showing actual intent does not require evidence of the nine elements of common law fraud. *Linder v. Lewis, Roca, Scoville, & Beauchamp,* 85 Ariz. 118, 333 P.2d 286 (1958).

The judgment awarded the appellee $12,000 for delinquent payments due under the original decree in addition to the amounts still unpaid under prior judgments. Attorney fees of $21,555.79, which included a $10,000 "lodestar" fee, and punitive damages in the amount of $72,000 were also awarded. The judgment ordered the transfer of certain assets found to be held by entities owned and controlled by the appellant as a result of fraudulent conveyances and gave the appellee liens against these assets and other assets found to be owned by the appellant. Finally, it directed the appellant to indemnify the appellee for any income tax liabilities imposed upon her as a result of his false reporting as alimony the property division sums paid to her.

The appellant contends on appeal that the trial court erred in: 1) awarding punitive damages; 2) awarding "lodestar" attorney fees; 3) ordering liens against property owned by third parties; 4) ordering that the Directors and Administrative Committee of the Trust are subject to the jurisdiction of the Arizona Superior Court when they were not parties to the action; 5) granting extraordinary remedies when ordinary remedies were readily available; and 6) ordering that a specific interest in the Trust be segregated and set aside for the appellee.

We affirm.

### THE "LODESTAR" FEE

We begin by recognizing that the designation of the $10,000 award as a "lodestar" fee was a misnomer. The lodestar is a fee which is calculated by multiplying the number of hours necessarily expended by a reasonable hourly rate of compensation. *Schweiger v. China Doll Restaurant, Inc.,* 138 Ariz. 183, 186 n. 5, 673 P.2d 927, 930 n. 5 (App.1983) The fact that the trial court used the wrong descriptive term does not affect the award. It is abundantly clear that the court awarded the $10,000 fee pursuant to A.R.S. § 12–341.01(C) because it found that the appellant's defense constituted harassment, was groundless, and was made in bad faith.

The court's findings 36 and 37 pertained to fees:

36. In this case, and with regard to these issues, this Court believes that pursuant to A.R.S. § 25–324, attorney's fees for the services rendered Petitioner should be awarded as Respondent is quite wealthy and Petitioner has been rendered near destitute by Respondent's actions. Moreover, this Court believes that attorney's fees should be awarded under A.R.S. § 12–341.01(C) in that the evidence here clearly and convincingly shows that respondent's defense herein was groundless, not made in good faith, and done solely for the purpose of harassing respondent's ex-wife.

37. Petitioner's attorney's have filed an Affidavit asking for $10,135.79 in attorney's fees and costs, in addition to testifying at the hearing of May 8th, 1985, that an additional $1,420.00 for services rendered for the filing of the Affidavit was then due and owing. The time and charges shown by counsel for Petitioner are reasonable and appropriate. However, the work done by Petitioner's counsel was of an exemplary nature, of the highest quality and extreme difficulty. It required substantial effort to trace Respondent's assets through the financial maze created solely to defraud creditors, hide assets and avoid taxes. That type of legal services should rewarded [sic] with a premium for such quality and excellence of service and determination and, therefore, this Court orders an award of "lodestar" premium of $10,000.00 in addition to the request of $11,555.79, making a total of $21,595.79 in attorney's fees and costs to be paid directly to counsel for Petitioner for their representation in the present action.

The appellant's contention that such a fee cannot exceed the agreed fee has been answered, in part, by our supreme court in *Taylor v. Southern Pacific Transportation Co.*, 130 Ariz. 516, 523, 637 P.2d 726, 733 (1981). There the court held:

Where there is a complete and repeated disregard of a court order and where there is no reasonable justification for its

breach, a court might, in its discretion, award attorneys fees as a sanction. See 6 J. Moore, Federal Practice Para. 54.-77(2) (2d ed. 1976). The integrity of the courtroom and the judicial process requires that the trial court have this remedy in exceptional circumstances.

See also *Auman v. Auman*, 134 Ariz. 40, 653 P.2d 688 (1982). The fee awarded under A.R.S. § 12–341.01(C) is not limited to the amount paid or agreed upon as in A.R.S. § 12–341.01(B). *Wean Water, Inc. v. Sta-Rite Industries, Inc.*, 141 Ariz. 315, 686 P.2d 1285 (App.1984). The fee awarded under A.R.S. § 12–341.01(C) is punitive in nature, and we believe it can be awarded in addition to any fee allowed under any other statute, including A.R.S. § 12–341.-01(B) or A.R.S. § 25–324. Otherwise, in a case such as this, where the prevailing party and/or the party who is unable to pay attorney fees is entitled to recover those fees, there would be no way to impose the sanctions envisioned under A.R.S. § 12–341.01(C). We do not believe that was the intention of the legislature. We note also that such an award may be justified under A.R.S. §§ 12–349, 350 added by Laws 1985, Ch. 225, Sec. 1.

## PUNITIVE DAMAGES

Both parties agree that the order to show cause proceeding was essentially an action for breach of contract and could not have been an action to find the appellant in contempt. The appellant's obligations to the appellee arose out of a property settlement agreement incorporated into the decree and were not for spousal maintenance or child support. *Proffit v. Proffit*, 105 Ariz. 222, 462 P.2d 391 (1969). See also *Luna v. Luna*, 125 Ariz. 120, 608 P.2d 57 (App.1979). The parties also agree that punitive damages may not ordinarily be assessed in contract actions. *Continental National Bank v. Evans*, 107 Ariz. 378, 489 P.2d 15 (1971). There is, however, an exception to this general rule which is present in this case. Punitive damages may be recoverable where the breach of contract constitutes a tort. *Lerner v.*

*Brettschneider*, 123 Ariz. 152, 598 P.2d 515 (App.1979); D. Dobbs, Law of Remedies, § 12.4 at 818 (1973); McCormick, Law on Damages, § 81 et seq. (1935). In *Stanback v. Stanback*, 297 N.C. 181, 254 S.E.2d 611 (1979) the court held that the wife's complaint for breach of a provision in a separation agreement sufficiently stated a claim for punitive damages for intentional infliction of serious emotional distress, an identifiable tort. But see *Den v. Den*, 222 A.2d 647 (D.C.1966).

The breach of contract here involved tortious conduct in at least two different ways. It was expressly found to be fraudulent. And it was also, at least implicitly, found to be in bad faith. The proof otherwise required in Arizona, and in the great majority of jurisdictions, that the negligence must be aggravated, outrageous, malicious, or wanton, is present in this case. *Hall v. Motorists Insurance Corp.*, 109 Ariz. 334, 509 P.2d 604 (1973). The trial judge found that the appellant's actions were willful, malicious, and contemptuous. We quote finding 39:

39. Punitive damages should be awarded against respondent for his willful, malicious and contemptuous actions in hiding and secreting asets, [sic] engaging in fraudulent financial schemes, plans and artifices to preclude Petitioner from securing the payments due her under the Decree, for fraudulently conveying assets to defraud of Petitioner's rights and for Respondent's presenting to this Court groundless defenses to Petitioner's action which defenses were urged solely for the purpose of harassing Petitioner. For all of these reasons an award of $72,000.00 in punitive damages is appropriate as it is three times the annual amount Respondent is to pay and should reasonably compensate Petitioner for all of the difficulties, turmoil, worries and heartache Petitioner has been subjected to by the Respondent for Respondent's purely malicious reasons.

Reluctant as we may be to extend the recovery of punitive damages into relatively new areas, we agree that the award is most appropriate under these facts. Since contempt will not lie against the appellant, except for the award of attorney fees, he would be able to continue his deceptions with impunity. The appellant agreed to the division of the community property incorporated into the decree. He was ordered to make the agreed payments. He blatantly defied that order, not once, not twice, but three times. The award of punitive damages here clearly promotes the objectives of punishment and deterrence. *Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 647 P.2d 629 (1982); Dobbs, supra, § 3.9.

## THE LIENS

In addition to the appellant's vested interest in the Retirement Trust of MCC, the court imposed liens upon the appellant's property in Arizona. The court granted the appellee liens against 300 shares of MCC stock, a townhouse on East Thomas Road in Phoenix, $10,000 of MCC debentures "owned" by the appellant's Foundation, and all of the assets of MCC. It had jurisdiction to impose such liens pursuant to A.R.S. § 25–318(C). We find no error.

## THE TRUST COMMITTEE

The court's order regarding the conduct of other members of the administrative committee of the MCC Retirement Trust Plan was advisory only. Paragraph 17 of the judgment provided that a copy of the judgment be sent to them. The appellant is in no position to contest that part of the order which stated that a failure to protect the appellant's vested rights in the trust would constitute a breach of trust and subject those other parties to liability. He is not aggrieved by that pronouncement.

## NECESSITY FOR REMEDIES

To some extent this issue concerns the liens ordered by the trial court. The appellant contends that the court got "carried away" and imposed unnecessary remedies. Although the findings do demonstrate that the trial judge was unfavorably impressed with the appellant's conduct, we

do not agree that the measures taken to protect the appellee's rights were an abuse of his discretion.

The amount owed pursuant to the judgment was approximately $123,500 plus interest. In addition, the balance of community property division to be paid in the future was $417,677. The evidence shows the value of some of the property upon which the liens were impressed, in addition to the Trust interest. The MCC stock, by the appellant's evidence, was worth $1,500. By the appellee's evidence, it was worth book value. The townhouse cost $40,000 in the early 1970s, but MCC claims a $100,000 lien against the property. MCC debentures amount to $10,000, but the debts are owed by the appellant's own company. No evidence shows the real value of the MCC assets.

The evidence proves that the appellant is a man of great wealth, whereas the appellee relies almost exclusively on the regular distribution of her interest in the community property to pay for her necessities. For 18 months, when the appellant either made wrongful deductions from the payments or refused to send them at all, the appellee was compelled to borrow funds. She is 53 years of age and has few employment-related skills.

Although the appellant has a vested interest in the Trust of about one and one-half million dollars, it is administered in New York and the amounts available for distribution are subject to the appellant's control. An example of the difficulty the appellee has already encountered in attempting to reach this asset is the Trust's answer to a writ of garnishment acknowledging the appellant's vested interest but stating that it was not then indebted to the appellant. We believe the various liens were necessary to protect the appellee's remaining community property and to secure payment of the judgment.

### THE ORDER UNDER THE RETIREMENT EQUITY ACT

■ In finding 38, the court stated:

38. That under the Employee Retirement and Investment Securities Act of 1984 Petitioner's interest in the $480,000.00 of Respondent's vested interest in The Trust of at least $1,500,000.00 needs to be segregated and made subject to a qualified domestic relations order pursuant to the Internal Revenue Code § 3424(p)(3) for purposes of initiating Petitioner's pay status under The Trust and fixing her monthly payments at $2,000.00 per month payable until paid in full, as well as notifying all members of the Administrative Committee of said Trust of Petitioner's rights and ordering that any violation of those rights can constitute a personal liability of those members as well as The Trust if it or they act to deny Petitioner her rights.

The Retirement Equity Act of 1984 was enacted to improve the delivery of retirement benefits and to provide for greater equity under private pension plans for workers, their spouses, and their dependents. Pub.L. No. 98–397, 98 Stat. 1426 (1984). The Act amended several provisions of the Employee Retirement Income Security Act of 1974 (ERISA). Pub.L. No. 93–406, 88 Stat. 829 (1974). ERISA now requires that "[e]ach pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." 29 U.S.C.A. § 1056(d)(3)(A)(1) (1985).

ERISA defines a "qualified domestic relations order" (QDRO) to be one "which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan...." 29 U.S.C.A. § 1056(d)(3)(B)(i)(I) (1985). The judgment of the trial court was intended to operate as a QDRO and its principal purpose was to ensure that the trustee and plan administrator were put on notice that the appellee had a vested right and interest in and to the Trust, which interest could not be defeated by any actions of the appellant, particularly since the appellant has check writing authority for the Trust.

The administrator of the plan must determine whether the order received from the domestic relations court is qualified. The administrator or, in this case, the adminis-

trative committee has 18 months to make that determination. 29 U.S.C.A. § 1056(d)(3)(H)(ii).

The Trust has not entered an appearance in this matter other than by its answer to the writ of garnishment. The appellee has not received notice from either the administrative committee of the Trust or the trustee denying QDRO status to this decree. We will not set aside that portion of the judgment on appeal. To the extent that the trial court has the authority to place a lien on assets of the appellant, the appellant's interest in the Trust being vested, the court can order a lien to ensure payment of the appellee's interest therein pursuant to A.R.S. § 25–318(C).

The appellee has moved for attorney's fees on appeal. We grant that motion. The amount of such fees will be determined upon compliance with Rule 21(c), Rules of Civil Appellate Procedure, 17A, A.R.S.

Affirmed.

LIVERMORE, P.J., and LACAGNINA, J., concur.